## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' COALITION, <br><br> Plaintiff, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF COMMERCE and UNITED STATES INTERNATIONAL TRADE COMMISSION, <br><br> Defendants. | Court No. 13-00391 <br><br> Before: Hon. Richard K. Eaton, Judge |

## ORDER

Upon consideration of Plaintiff the Diamond Sawblades Manufacturers' Coalition's ("DSMC") motion for judgment on the agency record, and all other papers and proceedings herein, it is hereby:

**ORDERED**, that DSMC's motion for judgment on the agency record is **GRANTED**, and it is further

**DECLARED**, that the Department of Commerce's and the U.S. International Trade Commission's ongoing five-year sunset review of the antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China is *ultra vires*; and it is further

**ORDERED**, that the Department of Commerce and the U.S. International Trade Commission terminate any five-year "sunset" review proceeding of the antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China that is not in accordance with 19 U.S.C. § 1675(c), which does not permit such a review to be conducted until after five years have passed from the November 4, 2009 date of publication of the antidumping duty order.

Court No. 13-00391

**SO ORDERED**.

_____
Judge Richard K. Eaton

Dated: _____
New York, New York

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

| | |
|---|---|
| DIAMOND SAWBLADES MANUFACTURERS' COALITION, | |
| Plaintiff, | Court No. 13-00391 |
| v. | Before: Hon. Richard K. Eaton, Judge |
| UNITED STATES DEPARTMENT OF COMMERCE and UNITED STATES INTERNATIONAL TRADE COMMISSION, | |
| Defendants. | |

**PLAINTIFF'S RULE 56.2 MOTION FOR
JUDGMENT ON THE AGENCY RECORD**

Pursuant to U.S. Court of International Trade Rule 56.2, Plaintiff the Diamond Sawblades Manufacturers' Coalition ("DSMC") hereby moves for judgment upon the agency record with respect to the U.S. Department of Commerce's ("the Department") and the U.S. International Trade Commission's ("the Commission") determination(s) to conduct a five-year "sunset" review of the antidumping duty order on diamond sawblades and parts thereof ("diamond sawblades) from the People's Republic of China ("China") under the asserted authority of 19 U.S.C. § 1675(c). The Department's and the Commission's initiation notices were published in the *Federal Register* on December 2, 2013 as *Initiation of Five-Year ("Sunset") Review*, 78 Fed. Reg. 72,061 (Dep't Commerce Dec. 2, 2013) and *Diamond Sawblades and Parts Thereof From China Institution of a Five-Year Review*, 78 Fed. Reg. 72,116 (Int'l Trade Comm'n Dec. 2, 2013).

DSMC respectfully moves, for the reasons explained in the accompanying memorandum, that this Court find that the agency's conduct of the five-year sunset year prior to the five-year anniversary of the date of publication of the antidumping duty order on diamond sawblades from

Court No. 13-00391

China is not in accordance with law.

DSMC further moves that the Court order the Department and the Commission to terminate any five-year review of the antidumping duty order on diamond sawblades and parts thereof from the People's Republic of China that is not in accordance with 19 U.S.C. § 1675(c), does not permit such a review to be conducted until after five years have passed from the November 4, 2009 date of publication of the antidumping duty order.

Respectfully submitted,

Daniel B. Pickard
Maureen E. Thorson

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to the Diamond Sawblades*
*Manufacturers' Coalition*

Dated: March 28, 2014

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE

DIAMOND SAWBLADES
MANUFACTURERS COALITION,

        Plaintiff,

    v.

UNITED STATES DEPARTMENT OF
COMMERCE and UNITED STATES
INTERNATIONAL TRADE
COMMISSION,

        Defendants.

Consol. Court No. 13-00391

Before: Hon. Richard K. Eaton, Judge

**PUBLIC DOCUMENT**

**Contains No Business Proprietary
Information**

---

## PLAINTIFF DIAMOND SAWBLADES MANUFACTURERS' COALITION'S MEMORANDUM IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Daniel B. Pickard
Maureen E. Thorson

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to the Diamond Sawblades
Manufacturers' Coalition*

March 28, 2014

Table of Contents

Page

I.    INTRODUCTION ..................................................................................................1

II.   RULE 56.2 STATEMENT.....................................................................................1

      A.    Administrative Decisions Under Review ...............................................1

      B.    Issue of Law Presented ..........................................................................1

III.  STATEMENT OF FACTS ......................................................................................1

IV.   SUMMARY OF ARGUMENT.................................................................................3

V.    STANDARD OF REVIEW.....................................................................................5

VI.   ARGUMENT ........................................................................................................6

      A.    The Language of the Tariff Act is Clear................................................7

      B.    Even if the Court Finds the Statute Ambiguous, the Agencies' Interpretation of the Statute Is Unreasonable and Is Not Entitled to Deference............................16

            1.    The Agencies' Arguments Ignores the Facts............................17

            2.    The Agencies' Past Practice Indicates That Their Current Interpretation is Unreasonable and Not In Accordance with Law.......................20

            3.    The SAA Does Not Support the Agencies' Interpretation .......22

            4.    The Agencies' Regulations and Citations to Past Judicial Precedent Do Not Support Their Interpretation ..............................................25

            5.    Conclusion ................................................................................25

VII.  CONCLUSION .....................................................................................................27

# TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Agro Dutch Industries, Ltd. v. United States,*
   508 F.3d 1024 (Fed. Cir. 2007) ..................................................................*passim*

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,*
   467 U.S. 837 (1984)......................................................................................5, 16

*Decca Hospitality Furnishing, LLC v. United States,*
   30 CIT 357 (2006) ...........................................................................................19

*Delverde, SrL v. United States,*
   202 F.3d 1360 (Fed. Cir. 2000) .........................................................................7

*Diamond Sawblades Mfrs. Coalition v. United States,*
   33 CIT 1422, 650 F. Supp. 2d 1331 (2009)...............................................2, 9, 18

*Diamond Sawblades Mfrs. Coalition v. United States,* Slip Op. 09-5
   (Ct. Int'l Trade Jan. 13, 2009) ...........................................................................2

*Diamond Sawblades Mfrs. Coalition v. United States,* Slip Op. 08-18
   (Ct. Int'l Trade Feb. 6, 2008).............................................................................2

*FDA v. Brown & Williamson Tobacco Corp.,*
   529 U.S. 120 (2000)................................................................................5, 8, 16

*Gustafson v. Alloyd Co.,*
   513 U.S. 561 (1995)..................................................................................*passim*

*Heino v. Shinseki,*
   683 F.3d 1372 (Fed. Cir. 2012) ......................................................................5, 7

*NSK Corp. v. United States Int'l Trade Commission,*
   716 F.3d 1352 (Fed. Cir. 2013) .........................................................................16

*NSK Ltd. v. United States,*
   115 F.3d 965 (Fed. Cir. 1997) ..........................................................................10

*Tianjin Magnesium Int'l Co., Ltd. v. United States,*
   32 CIT 1 .........................................................................................................19

*Timken Co. v. United States,*
   354 F.3d 1334 (Fed. Cir. 2004) ...............................................................9, 10, 11

*TRW Inc. v. Andrews,*
  534 U.S. 19 (2001)............................................................................................................13

*Wheatland Tube Co. v. United States,*
  495 F.3d 1355 (Fed. Cir. 2007) ..........................................................................................6

**FEDERAL STATUTES**

19 U.S.C. § 1516a(b)(1)(B)(i) ...............................................................................................5

19 U.S.C. § 1673(e) ...............................................................................................................18

19 U.S.C. § 1673b(d)(2) ........................................................................................................20

19 U.S.C. § 1673d(c)(4) ........................................................................................................20

19 U.S.C. § 1673e ...............................................................................................................8, 11

19 U.S.C. § 1673e(a) .....................................................................................................*passim*

19 U.S.C. § 1675(a) ...............................................................................................................17

19 U.S.C. § 1675(a)(1) ...............................................................................................4, 14, 21

19 U.S.C. § 1675(c) .......................................................................................................*passim*

19 U.S.C. § 1675(c)(1) ..................................................................................................*passim*

19 U.S.C. §§ 1675(c)(1) & (2) .............................................................................................24

19 U.S.C. § 1675(c)(2) ..............................................................................................12, 13, 15

19 U.S.C. §§ 1675(c)(2) & (3) .............................................................................................13

19 U.S.C. § 1675(c)(5) ..........................................................................................................13

19 U.S.C. § 1675(d)(2) ..........................................................................................................21

19 U.S.C. § 3512(d)...............................................................................................................24

19 U.S.C. § 16735e(a) ...........................................................................................................20

**ADMINISTRATIVE MATERIALS**

*Initiation of Five-Year ("Sunset") Review,* 78 Fed. Reg. 72,061
  (Dep't Commerce Dec. 2, 2013).....................................................................................1, 3, 8

*Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650 (Dep't
  Commerce May 26, 2011) ....................................................................................................20

*Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 78 Fed. Reg. 65,612 (Dep't Commerce Nov. 1, 2013)..................................................................................................14

*Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092 and 1093, USITC Pub. 4007 (May 2008).........................................2

*Diamond Sawblades and Parts Thereof From China and Korea*, Inv. Nos. 731-TA-1092-1093, USITC Pub. 3862 (July 2006) .................................................2

*Diamond Sawblades and Parts Thereof From China Institution of a Five-Year Review*, 78 Fed. Reg. 72,116 (Int'l Trade Comm'n Dec. 2, 2013) .....................................................1, 3, 8

*Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) ..........................................................................1

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 78 Fed. Reg. 11,143 (Dep't Commerce Feb. 15, 2013)..................................................................14, 20

*Diamond Sawblades and Parts Thereof From the People's Republic of China*, 78 Fed. Reg. 36,166 (Dep't Commerce June 17, 2013) ........................................................14

*Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 6,570 (Dep't Commerce Feb. 10, 2009) ...........................2, 9

*Diamond Sawblades and Parts Thereof From the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 57,145 (Dep't Commerce Nov. 4, 2009) ........................2, 11

*Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 Fed. Reg. 40,565 (Dep't Commerce July 12, 2012)...................20

*Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 Fed. Reg. 77,017 (Dep't Commerce Dec. 31, 2012) ...................14

*Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 Fed. Reg. 79,392 (Dep't Commerce Dec. 1, 2013) .....................22

*Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin*, 63 Fed. Reg. 18,871 (Dep't Commerce Apr. 16, 1998)..............................................................................25

## LEGISLATIVE MATERIALS

H.R. Rep. No. 96-317 (1979), *reprinted in* 1979 U.S.C.C.A.N. 1293 ...................................18, 19

S. Rep. No. 96-249 (1979), *reprinted in* 1979 U.S.C.C.A.N. 315................................................18

**OTHER AUTHORITIES**

AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011)....................10, 11

NEW SHORTER OXFORD ENGLISH DICTIONARY (4th ed. 1993), Vol. I...........................................11

NEW SHORTER OXFORD ENGLISH DICTIONARY (4th ed. 1993), Vol. II ...................................10, 11

WEBSTER'S II NEW COLLEGE DICTIONARY (3d ed. 2005) .......................................................10, 11

## I.   <u>INTRODUCTION</u>

On behalf of the Diamond Sawblades Manufacturers' Coalition ("DSMC"), plaintiff in this action, we respectfully submit the following memorandum in support of DSMC's Rule 56.2 motion for judgment on the agency record.

## II.   <u>RULE 56.2 STATEMENT</u>

### A.   <u>Administrative Decisions Under Review</u>

DSMC herein challenges the determination(s) of the Department of Commerce (the "Department") and the U.S. International Trade Commission (the "Commission") to conduct a five-year "sunset" review of the antidumping duty order on diamond sawblades and parts thereof ("diamond sawblades") from the People's Republic of China ("China") under the asserted authority of 19 U.S.C. § 1675(c). *See Initiation of Five-Year ("Sunset") Review,* 78 Fed. Reg. 72,061 (Dep't Commerce Dec. 2, 2013); *Diamond Sawblades and Parts Thereof From China Institution of a Five-Year Review*, 78 Fed. Reg. 72,116 (Int'l Trade Comm'n Dec. 2, 2013).

### B.   <u>Issue of Law Presented</u>

Whether the Department's and the Commission's determination(s) to conduct a five-year "sunset" review of the antidumping duty order on diamond sawblades from China prior to the time period specified in 19 U.S.C. § 1675(c)(1), *i.e.*, before five years have elapsed from the date of publication of the antidumping duty order, is in accordance with law.

## III.   <u>STATEMENT OF FACTS</u>

On May 22, 2006, the Department published its final less-than-fair-value determination in the antidumping duty investigation on diamond sawblades from China. *See Diamond Sawblades and Parts Thereof from the People's Republic of China*, 71 Fed. Reg. 29,303 (Dep't Commerce May 22, 2006) (final deter. of sales at less than fair value and final partial affirmative deter. of critical circumstances).  The Commission subsequently issued a negative material injury

1

determination. *See Diamond Sawblades and Parts Thereof From China and Korea*, Inv. Nos. 731-TA-1092-1093 (Final), USITC Pub. 3862 (July 2006).

DSMC appealed the Commission's determination to this Court. On February 6, 2008, this Court remanded the Commission's final injury determination back to the Commission for further consideration. *See Diamond Sawblades Mfrs. Coalition v. United States*, Ct. No. 06-247, Slip Op. 08-18 (Ct. Int'l Trade Feb. 6, 2008). On remand, the Commission found that subject imports threatened the domestic diamond sawblades industry with material injury. *See Diamond Sawblades and Parts Thereof from China and Korea*, Inv. Nos. 731-TA-1092 and 1093 (Final) (Remand), USITC Pub. 4007 (May 2008). The Court sustained the Commission's remand determination in a confidential opinion issued on January 13, 2009. *See Diamond Sawblades Mfrs. Coalition v. United States*, Ct. No. 06-00247, Slip Op. 09-5 (Ct. Int'l Trade Jan. 13, 2009).

On February 10, 2009, the Department published a *Federal Register* notice suspending liquidation of incoming entries of Chinese diamond sawblades effective as of January 23, 2009 (the date on which the agency received, from the Commission, a copy of the Commission's judicially-affirmed remand determination), but did not publish an antidumping duty order. *See Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 6,570 (Dep't Commerce Feb. 10, 2009) (notice of court decision not in harmony with final deter. of the antidumping duty investigations). Pursuant to DSMC's petition for a writ of mandamus to compel publication, the Court ordered publication of the antidumping duty order on Chinese diamond sawblades on September 30, 2009. *Diamond Sawblades Mfrs. Coalition v. United States*, 33 CIT 1422, 650 F. Supp. 2d 1331 (2009). The Department published the order on November 4, 2009. *See Diamond Sawblades and Parts Thereof From the*

*People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 57,145 (Dep't Commerce Nov. 4, 2009) (antidumping duty orders).

In August of 2013, after learning of the Department's and the Commission's intent to initiate a five-year review of the antidumping duty order on diamond sawblades from China using the January 23, 2009 date as the anniversary date of the order, DSMC alerted both agencies to the illegality of such a premature sunset review.   Specifically, DSMC sent a letter to the Acting General Counsel of the Commission and the Chief Counsel of the Department's International Trade Administration, setting out its understanding of the statute. *See* Pl.'s Mot. for TRO and for Prelim. Inj. at Attachments A-1 and A-2 (Dec. 26, 2013), ECF No. 10. The agencies did not respond to DSMC's letter, and on December 2, 2013, approximately four years and one month after the order was published, the Department and the Commission published notices in the *Federal Register* of their decisions to conduct a sunset review of the antidumping duty order on diamond sawblades from China. *See Initiation of Five-Year ("Sunset") Review,* 78 Fed. Reg. 72,061 (Dep't Commerce Dec. 2, 2013); *Diamond Sawblades and Parts Thereof From China Institution of a Five-Year Review*, 78 Fed. Reg. 72,116 (Int'l Trade Comm'n Dec. 2, 2013). On December 4, 2013, DSMC initiated this action challenging the Department's and the Commission's decisions to conduct a sunset review of the order on diamond sawblades from China prior to the five-year anniversary date of the publication of the antidumping duty order. *See* Complaint, (Dec. 4, 2013), ECF No. 2.

## IV.    **SUMMARY OF ARGUMENT**

The Department's and the Commission's conduct of a five-year "sunset" review of the antidumping duty order on diamond sawblades from China prior to five years from the date of publication of the order is inconsistent with the plain language of 19 U.S.C. § 1675(c)(1) and is

therefore not in accordance with law. This section authorizes the agencies to conduct five-year "sunset" reviews of antidumping duty orders only five years after the date on which the relevant order is published. Congress has spoken directly to the question at bar. Congress has specifically stated that such reviews are premised on the passage of five years from the date of publication of an antidumping duty order. Congress has provided a particularized definition of "antidumping duty order," and the meaning of "publication" and "after" is plain and unambiguous. Moreover, this court has already held that January 23, 2009, which is the date that the agencies now argue they are effectively treating as the "date of publication" of the order, *see* Def.'s Resp. to Pl.'s Mot. for Prelim. Inj. (Feb. 3, 2014) at 5-10 ("Def's Resp."), is not the date upon which the antidumping duty order on diamond sawblades from China, or anything that is the legal equivalent of such an order, was published.

Should this Court determine that the language of 19 U.S.C. § 1675(c)(1) is ambiguous with respect to when a sunset review order should be conducted, the agencies have not articulated a reasonable basis for their reading of the phrase "5 years after the date of publication of . . . an antidumping duty order" to permit them to conduct a sunset review of the antidumping duty order on diamond sawblades earlier than November 4, 2009. The agencies' interpretation is based on a misunderstanding of the nature of an "antidumping duty order" and the facts of this case. The agencies' interpretation further involves reading the phrase "5 years after the date of publication of . . . an antidumping duty order," as it appears in 19 U.S.C. § 1675(c)(1) inconsistently with how the agencies have read (and continue to read) that same language as it appears in 19 U.S.C. § 1675(a)(1). Finally, the various arguments raised thus far by the agencies in defense of their interpretation show only that their reading of the statute is not supported by the facts of this case, by the Court's prior opinions relating to the diamond sawblades

investigation, by the agencies' own past practice specific to this antidumping order, by the

Statement of Administrative Action ("SAA") accompanying the Uruguay Round Agreements

Act ("URAA"), by the agencies' own policies, or by prior precedent generally.  The agencies'

interpretation of the statute, therefore, is unreasonable and is not entitled to judicial deference.

## V.   **STANDARD OF REVIEW**

The Court reviews the Department's and the Commission's actions in antidumping

proceedings to determine whether they are "unsupported by substantial evidence on the record,

or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The "otherwise not in

accordance with law" standard governs the agencies' legal interpretations of the statutes they

administer. To determine whether the agencies' legal interpretation and application of the

antidumping statute is in accordance with law, the Court applies the two-step test set forth by the

United States Supreme Court in *Chevron U.S.A., Inc. v. Natural Resources Defense Council,*

*Inc.*, 467 U.S. 837 (1984).

Under the first prong of the test enunciated in *Chevron*, the Court "must first ask

'whether Congress has directly spoken to the precise question at issue.'" *Agro Dutch Industries,*

*Ltd. v. United States*, 508 F.3d 1024, 1030 (Fed. Cir. 2007) (citing *FDA v. Brown & Williamson*

*Tobacco Corp.*, 529 U.S. 120, 132 (2000) (quoting *Chevron*, 467 U.S. at 842)). If Congress has

spoken to the precise issue, the inquiry comes to an end, and the court "must give effect to the

unambiguously expressed intent of Congress." *FDA v. Brown & Williamson Tobacco Corp.*,

529 U.S. at 132 (quoting Chevron, 467 U.S. at 843). To determine whether the plain language of

a statue clearly shows the intent of Congress, courts "employ traditional tools of statutory

construction and examine 'the statute's text, structure, and legislative history, and apply the

relevant canons of interpretation.'" *Heino v. Shinseki*, 683 F.3d 1372, 1378 (Fed. Cir. 2012)

(citing *Delverde, SrL v. United States*, 202 F.3d 1360, 1363 (Fed. Cir. 2000)).  In addition "a 'term should be construed, if possible, to give it a consistent meaning throughout' a particular statute." *Agro Dutch Industries*, 508 F.3d at 1032; *see also Gustafson v. Alloyd Co.*, 513 U.S. 561, 570 (1995) ("[I]dentical words used in different parts of the same act are intended to have the same meaning.") (citation omitted).

In the absence of clear direction from the statute, the court must then "ask whether there is ambiguous statutory language that might authorize the agency to fill a statutory gap," and, in turn, "whether Commerce's interpretation of ambiguous statutory language is based on a permissible interpretation of the statute." *Agro Dutch Industries*, 508 F.3d at 1030 (citing *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 815 (Fed. Cir. 2002)). In determining whether an agency has advanced a reasonable interpretation of ambiguous statutory language, the courts consider, inter alia, "the express terms of the provisions at issue, the objectives of those provisions, and the objectives of the antidumping scheme as a whole." *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1361 (Fed. Cir. 2007) (citing *NSK Ltd. v. United States*, 217 F. Supp. 2d 1291 (Ct. Int'l Trade 2002)). However, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." *Agro Dutch Industries*, 508 F.3d at 1030 (citing *MCI Telecomms. Corp. v. AT&T Co.,* 512 U.S. 218, 229 (1994)).

## VI.   <u>ARGUMENT</u>

Title 19 U.S.C. § 1675(c)(1) authorizes the Department and the Commission to conduct five-year "sunset" reviews of antidumping duty orders only five years after the date on which the relevant order is published. In the instant case, the agencies' conduct of a five-year "sunset" review of the antidumping duty order on diamond sawblades from China prior to five years from

the date of publication of the order is inconsistent with the plain language of section 1675(c)(1) and is therefore not in accordance with law.

Even if the Court were to determine that the Tariff Act is ambiguous, the agencies' interpretation of the statute is unreasonable and is therefore not entitled to deference. As discussed below, the agencies have not articulated a reasonable basis for their reading of the phrase "5 years after the date of publication of . . . an antidumping duty order" to permit them to conduct a sunset review of the antidumping duty order on diamond sawblades earlier than November 4, 2009. The agencies cannot lawfully cut off a portion of the remedy owed to DSMC, and their desire to do so is unreasonable based on the statute as a whole, the specific facts of this case, the agencies' own practice, and the SAA. The agencies' interpretation should not be sustained.

### A.    The Language of the Tariff Act is Clear

To determine whether the plain language of a statue clearly shows the intent of Congress, courts "employ traditional tools of statutory construction and examine 'the statute's text, structure, and legislative history, and apply the relevant canons of interpretation.'" *Heino*, 683 F.3d at 1378 (citing *Delverde*, 202 F.3d at 1363). If the court ascertains "'that Congress had an intention on the precise question[s] at issue, that intention is the law and must be given effect.'" *Delverde*, 202 F.3d at 1363 (citing *Chevron*, 467 U.S. at 843 n.9). Under such circumstances, "the only issue is whether the agency acted in accordance with that intent." *Delverde*, 202 F.3d at 1363 (citing *Chevron*, 467 U.S. at 842). In the instant case, the statute clearly indicates that Congress intended for five-year sunset reviews of antidumping duty orders to be conducted only five years after the date on which the relevant antidumping duty order is published.

The agencies' initiation notices for the sunset review on diamond sawblades from China state that the authority for their review stems from 19 U.S.C. § 1675(c). *See Initiation of Five-*

**PUBLIC DOCUMENT**

*Year ("Sunset") Review,* 78 Fed. Reg. 72,061 (Dep't Commerce Dec. 2, 2013); *Diamond Sawblades and Parts Thereof From China Institution of a Five-Year Review*, 78 Fed. Reg. 72,116 (Int'l Trade Comm'n Dec. 2, 2013). Title 19 U.S.C. § 1675(c) provides, in relevant part:

> (c) Five-year review
>
> (1) In general
>
> . . . 5 years after the date of publication of—
>
> > (A) . . . an antidumping duty order . . .
>
> the administering authority and the Commission shall conduct a review to determine . . . whether revocation of the . . . antidumping duty order . . . would be likely to lead to continuation or recurrence of dumping . . . and of material injury.

19 U.S.C. § 1675(c)(1).

There are three potential questions that could be asked with respect to the interpretation of 19 U.S.C. § 1675(c)(1). First, "what is an antidumping duty order?" Congress "'has directly spoken to the precise question at issue.'" *Brown & Williamson.*, 529 U.S. at 132 (quoting *Chevron*, 467 U.S. at 842)); *see Agro Dutch Industries*, 508 F.3d at 1030 (explaining that in seeking the unambiguous meaning of a statutory term, courts start with the statute's definition of the term.). An antidumping duty order, per 19 U.S.C. § 1673e, is an order that:

> (1) directs customs officers to assess an antidumping duty equal to the amount by which the normal value of the merchandise exceeds the export price (or the constructed export price) of the merchandise, within 6 months after the date on which the administering authority receives satisfactory information upon which the assessment may be based, but in no event later than –
>
> > (A) 12 months after the end of the annual accounting period of the manufacturer or exporter within which the merchandise is entered, or withdrawn from warehouse, for consumption, or
> >
> > (B) in the case of merchandise not sold prior to its importation into the United States, 12 months after the end of the annual accounting period of the manufacturer or exporter within which it is sold in the United States to a person who is not the exporter of that merchandise,

(2) includes a description of the subject merchandise, in such detail as the administering authority deems necessary, and

(3) requires the deposit of estimated antidumping duties pending liquidation of entries of merchandise at the same time as estimated normal customs duties on that merchandise are deposited.

19 U.S.C. § 1673e(a).

There is no doubt that the February 10, 2009 *Timken* notice published by the Department was *not* an antidumping duty order.[1] This Court determined as much in granting DSMC's petition for a writ of mandamus to compel publication of such an order. *See Diamond Sawblades Mfrs. Coalition v. United States*, 33 CIT 1422, 650 F. Supp. 2d 1331 (2009). After all, DSMC would hardly have had a "clear and indisputable right" to a writ to compel publication of an order if an order (or its functional equivalent) had already been published. *Id.* at 1338. Indeed, the court specifically rejected the argument that suspension of liquidation pursuant to the *Timken* notice (along with the potential retroactive collection of cash deposits or duties, should DSMC ultimately prevail in its litigation regarding the Commission's original negative determination) afforded DSMC the relief to which it was due under law. *Id.* at 1355 ("[T]he court cannot agree that the future collection of cash deposits (or, as the case may be, the collection of retroactive duties, with interest) provides the same benefit to the plaintiff as would immediate issuance of an order and the collection of cash deposits."). As discussed further below, *see infra* Part VI.B.1., one of the defining hallmarks of an antidumping duty order is that it establishes an ongoing

---

[1]     The February 10, 2009 notice ordered suspension of liquidation retroactive to January 23, 2009. *See Diamond Sawblades and Parts Thereof from the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 6,570 (Dep't Commerce Feb. 10, 2009) (notice of court decision not in harmony with final deter. of the antidumping duty investigation). But, while the agencies have treated January 23, 2009 as the "effective" date of the order here, *see infra* Part VI.B.1., it remains that no antidumping duty order on diamond sawblades from China was published in the *Federal Register* on January 23, 2009.

obligation for importers to pay estimated duties upon the entry of merchandise in real-time. Until the November 4, 2009 publication of the order, nothing established such an ongoing obligation with respect to subject diamond sawblades.

We thus turn to the second question: "what is the date of publication of an antidumping duty order?" While the Tariff Act of 1930 does not include a specific definition for "date of publication," this phrase is no term of art (unlike "antidumping duty order"). "Publication," as defined by WEBSTER'S II NEW COLLEGE DICTIONARY, means "[t]he act or process of publishing printed matter" or "[c]ommunication of information to the public."[2] WEBSTER'S II NEW COLLEGE DICTIONARY 915 (3d ed. 2005); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) 1424 (defining "publication" as "[t]he act or process of publishing matter in print or electronic form" or "[c]ommunication of information to the public"); THE NEW SHORTER OXFORD ENGLISH DICTIONARY (4th ed. 1993), Vol. II, 2405 (defining "publication" as "[t]he action of making something generally known; public declaration or announcement"). This is not an ambiguous definition: publication of an antidumping duty order occurs when such an order is communicated to the public, whether in printed form or otherwise. As such, Congress has spoken clearly and directly to the question of the conditions under which sunset reviews are to be conducted (*i.e.*, five years after the date upon

---

[2]     The Federal Circuit has recognized that resort to dictionaries is proper when considering the plain meaning of a term not specifically defined in the Tariff Act of 1930. *See NSK Ltd. v. United States*, 115 F.3d 965, 974 (Fed. Cir. 1997) ("'[w]here Congress uses terms that have accumulated settled meaning under either equity or the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms.'") (citing *Nat'l Labor Relations Bd. v. Amax Coal Co.*, 453 U.S. 322, 329 (1981)); *Agro Dutch Industries*, 508 F.3d at 1031 ("'In order to ascertain the established meaning of a statutory term . . . , it is appropriate to consult dictionaries.'") (citations omitted); *Timken Co. v. United States*, 354 F.3d 1334, 1341 (Fed. Cir. 2004).

which an antidumping duty order, as defined in 19 U.S.C. § 1673e, is communicated to the public).[3]

It is particularly clear that with respect to the antidumping duty order here, publication did not occur on January 23, 2009, or February 10, 2009, or at any time prior to November 4, 2009. The antidumping duty order here (*i.e.*, an order as defined in 19 U.S.C. § 1673e), was communicated to the public through the *Federal Register* on November 4, 2009. *Diamond Sawblades and Parts Thereof From the People's Republic of China and the Republic of Korea*, 74 Fed. Reg. 57,145 (Dep't Commerce Nov. 4, 2009) (antidumping duty orders). Moreover, this Court has already determined that the *Timken* notice published on February 10, 2009, making suspension of liquidation retroactive to January 23, 2009, was not an antidumping duty order; thus, publication of that notice was not the communication of such an antidumping duty order to the public.

There is one final question: What does "after" mean? The plain meaning of "after," in the temporal sense in which it is used in 19 U.S.C. § 1675(c), is "[s]ubsequent to." WEBSTER'S II NEW COLLEGE DICTIONARY 21 (3d ed. 2005); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) 30 (defining "after" as "[s]ubsequent in time to; at a later time than"); THE NEW SHORTER OXFORD ENGLISH DICTIONARY (4th ed. 1993), Vol. I, 38 (defining "after" as "[f]ollowing in time, in succession to," "[f]ollowing the interval of; at the close of;" and providing the examples "[a]fter eleven years I was composing Love-letters

---

[3]    "Publish," for its part, is "1. To issue and prepare (printed material) for public distribution or sale. 2. To bring to public notice: ANNOUNCE." WEBSTER'S II NEW COLLEGE DICTIONARY 916 (3d ed. 2005); *see also* THE AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE (5th ed. 2011) 1424 (defining "publish" as "To prepare and issue (a book, music, or other material) for public distribution, especially for sale" or "To bring to public attention; announce."); THE NEW SHORTER OXFORD ENGLISH DICTIONARY (4th ed. 1993), Vol. II, 2405 (defining "publish" as "make generally known; declare or report openly; announce; disseminate.").

again.";[4] June is four months after February; 10 p.m. is two hours after 8 p.m., and "five years . . . after" means at the close of five years subsequent to the "date of publication of an antidumping duty order.").

In sum, the plain language of 19 U.S.C. § 1675(c) authorizes sunset reviews "five years . . . after the date of publication of an antidumping duty order." Congress has clearly defined "antidumping duty order," and the meaning of "date of publication" and "after" is plain. The statute thus premises the conduct of sunset reviews upon the passage of five years from such a date. The order here was published on November 4, 2009. As such, the Tariff Act grants the agencies authority to conduct a sunset review of this order as of November 4, 2014 onward. Thus, title 19 U.S.C. § 1675(c)(1) "'has a plain and unambiguous meaning with regard to the particular dispute in [this] case,' and [the] inquiry is thus at an end." *See Agro Dutch Industries*, 508 F.3d at 1032-33 (citation omitted).

This conclusion is not undermined by 19 U.S.C. § 1675(c)(2), which provides for the Department to publish a notice of initiation "[n]ot later than 30 days before the fifth anniversary of the date [of publication of an antidumping duty order]." Despite this provision for initiation notices that pre-date the five year anniversary, 19 U.S.C. § 1675(c) as a whole makes clear that the review itself is to be conducted *after* five years have passed from the date of publication of an antidumping duty order. To hold otherwise would be to read 19 U.S.C. § 1675(c)(1) as a meaningless superfluity. This, in turn, would violate the "'cardinal principle of statutory construction' that 'a statute ought . . . to be so construed [such] that . . . no clause, sentence, or word shall be superfluous . . . .'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001); *see Agro Dutch*

---

[4]     The agencies have not yet made any direct arguments with respect to the meaning of the term "after." Instead, their argument has focused on the interpretation of "date of publication." *See* Def.'s Resp. at 5-10. That said, to the extent that the agencies' discussion of the SAA implicates the meaning of "after," *see infra* Part VI.B.3.

*Industries,* 508 F.3d at 1032 (deeming unsanctionable the Department's interpretation of the word "affiliated" in the Tariff Act because it eliminated the statute's distinction between two categories, rendering one of the categories superfluous) (citation omitted).

Title 19 U.S.C. § 1675(c)(2) requires the Department to publish a notice of initiation of all sunset reviews. The purpose of the notice of initiation is to gauge the potential desire of the interested parties with respect to continuation of the order, and otherwise to prevent the agencies from conducting "full" review proceedings with respect to orders in which there is no interest. *See* 19 U.S.C. §§ 1675(c)(2) & (3). Title 19 U.S.C. § 1675(c)(5) indicates that the agencies' reviews must normally be completed within 240-360 days. 19 U.S.C. § 1675(c)(5). If 19 U.S.C. § 1675(c)(1) did not exist, the statute would provide for the agencies to conduct a review at any time up to five years after an antidumping duty order was published. But 19 U.S.C. § 1675(c)(1) does exist. It plainly states that reviews are to be conducted five years *after* an order's date of publication. This language must be given meaning; as shown by the agencies' uniform past practice, they have given it meaning in the way that the statute itself requires: by publishing notices of initiation approximately 30 days prior to the fifth anniversary date of an order's publication, and conducting the review itself afterward. *See* Pl.'s Mot. for TRO and for Prelim. Inj. at Attachment B (Dec. 26, 2013), ECF No. 10 (comparing notices of publication of orders with notices instituting initial sunset reviews).

Furthermore, rules of statutory construction provide that "a 'term should be construed, if possible, to give it a consistent meaning throughout' a particular statute." *Agro Dutch Industries,* 508 F.3d at 1032; *see also Gustafson,* 513 U.S. at 570 ("[I]dentical words used in different parts of the same act are intended to have the same meaning.") (citation omitted). Thus, the agencies' interpretation of the phrase "date of publication . . . of the antidumping duty order" as it appears

in 19 U.S.C. § 1675(c)(1) must be consistent with its interpretation of that phrase as it appears in other parts of the same statute. Yet, this is not the case.

Title 19 U.S.C. § 1675(a)(1) provides for administrative reviews of antidumping duty orders "[a]t least once during each 12-month period beginning on the anniversary of the *date of publication of . . .* an antidumping duty order." (emphasis added). In conducting administrative reviews of the antidumping duty order on diamond sawblades from China, the Department has interpreted the phrase "date of publication," as it appears in 19 U.S.C. § 1675(a)(1), to mean November 4, 2009.[5] Yet, for purposes of initiating a sunset review of the same order, the Department has interpreted "date of publication" to mean January 23, 2009. The Department's interpretation, therefore, renders the same phrase, *i.e.*, "date of publication," as having different meanings in different sections of the same act, which is a violation of the normal rules of statutory construction and cannot be sanctioned. *See Gustafson*, 513 U.S. at 570 (adopting the premise that a term should be construed, if possible, to give it a consistent meaning throughout the relevant statute).

---

[5]     *See Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review*, 78 Fed. Reg. 65,612, 65,613 (Dep't Commerce Nov. 1, 2013) (notifying interested parties of the opportunity to request an administrative review for the period November 1, 2012 through October 31, 2013); *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 78 Fed. Reg. 36,166 (Dep't Commerce June 17, 2013) (final results of antidumping duty admin. review; 2010–2011) (stating that review covers the period from November 1, 2010 through October 1, 2011); *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 Fed. Reg. 77,017, 77,019 (Dep't Commerce Dec. 31, 2012) (initiating review of the Chinese diamond sawblades order for the period from November 1, 2011 through October 31, 2012). The initial review covered the period from January 23, 2009 through October 31, 2010.   *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 78 Fed. Reg. 11,143 (Dep't Commerce Feb. 15, 2013) (final results of antidumping duty admin. review; 2009–2010).    In any event, the agency published its notice of opportunity to request that review in November of 2010, thus further demonstrating that the Department has previously consistently treated November as the anniversary month of the order.

**PUBLIC DOCUMENT**

The agencies assert that because January 23, 2009 is the date that the order *should* have been published, and was moreover referenced as the order's "effective date" in the November 4, 2009 *Federal Register* notice publishing the order, the Tariff Act should be construed to permit the treatment of January 23, 2009 as the "date of publication." Def.'s Resp. at 5-7. The agencies further describe the actual November 4, 2009 date of publication as an "artifact" of the Department's error in failing to publish the order on January 23, 2009. Def.'s Resp. at 6-7. As such, the agencies argue that the November 4, 2009 date "should not control subsequent decisions about how the order is to be administered." *Id.* at 7. Underlying the agencies' argument is the assumption that, by making the November 4, 2009 order "effective" as of January 23, 2009, the agencies should be considered to have fully corrected the error that occurred by virtue of the original failure to publish, such that the error should be treated as though it never existed.

But, for the Court to accept the agency's argument, the Court must set the plain language of the statute aside. As noted above, the Tariff Act of 1930 premises the conduct of sunset reviews on the "date of publication . . . of an antidumping duty order." 19 U.S.C. § 1675(c)(1). It does not premise the conduct of such reviews on the date on which an order should have been published, or could have been published. *See id.* The actual date of publication controls. Likewise, the Tariff Act of 1930 makes no reference to the "effective date" of orders. *See id.* Again, the "date of publication" controls. The Court should not accept the agencies' invitation to simply ignore the plain Congressional mandate here.

In sum, the agencies initiated their sunset review in December 2013, well before five years had elapsed.[6] Accordingly, the review that the agencies are conducting is premature and

---

[6]     The sunset review initiation was also well before the four years and 11 months specified with respect to publication of initiation notices, per 19 U.S.C. § 1675(c)(2), which the agencies have always carefully observed. *See* Pl.'s Mot. for TRO and for Prelim. Inj. at Attachment B

without statutory authorization. *See NSK Corp. v. United States Int'l Trade Commission*, 716
F.3d 1352, 1355 (Fed. Cir. 2013) ("Pursuant to 19 U.S.C. § 1675(c), every five years *after the
issuance of an antidumping duty order*, Commerce and the Commission conduct a review of
whether an antidumping order is still necessary to protect the domestic industry or whether that
order can be 'sunset.'") (emphasis added). Because Congress has spoken directly to the question
at bar, the agencies' premature review is inconsistent with the clear statutory language, and the
review must be declared *ultra vires*.

### B.   Even if the Court Finds the Statute Ambiguous, the Agencies' Interpretation of the Statute Is Unreasonable and Is Not Entitled to Deference

As explained above, Congress spoke directly to the question at issue here, stating that
sunset reviews are to be conducted "5 years after the date of publication . . . of an antidumping
duty order." As such, under "Step 1" of *Chevron*, this court should "give effect to the
unambiguously expressed intent of Congress." *Brown & Williamson.*, 529 U.S. at 132 (quoting
*Chevron*, 467 U.S. at 843).   However, should the court perceive ambiguity in 19 U.S.C. §
1675(c)(1) with respect to the triggering event for sunset reviews, DSMC avers that the agencies
have not advanced a reasonable interpretation of this statutory provision for the reasons
articulated below. *See Agro Dutch Industries*, 508 F.3d at 1030 (citing *FAG Italia S.p.A. v.
United States*, 291 F.3d 806, 815 (Fed. Cir. 2002)) (holding that when a court determines that a
statute is ambiguous on a particular issue, the court must determine "whether [the Department's]
interpretation of ambiguous statutory language is based on a permissible interpretation of the
statute.").

---

(Dec. 26, 2013), ECF No. 10 (comparing notices of publication of orders with Commission's
notices instituting initial sunset reviews).

The agencies advance four main defenses for their interpretation. First, the agencies argue that because January 23, 2009 is the date that the order should have been published, and was moreover referenced, in the November 4, 2009 *Federal Register* notice publishing the order, as the order's "effective date," the Tariff Act should be construed to permit the treatment of January 23, 2009 as the "date of publication." Second, they claim that their prior interpretations of the relevant portion of 19 U.S.C. § 1675(c)(1) generally, and identical language in 19 U.S.C. § 1675(a) with respect to this proceeding specifically, do not undermine their unique interpretation of 19 U.S.C. § 1675(c)(1) here. Third, the agencies argue that their interpretation is supported by the SAA. Fourth, they argue that their interpretation finds supports in the agencies' regulations and in past judicial precedent. *See* Def.'s Resp. at 5-10.

A review of these claims serves only to confirm that the agencies have interpreted the statute in an unreasonable manner.

### 1.    The Agencies' Arguments Ignore the Facts

As previously noted, the agencies assert that because January 23, 2009 is the date that the order *should* have been published, the Tariff Act should be construed to permit constructive treatment of January 23, 2009 as the "date of publication." Def.'s Resp. at 5-7. As noted above, the plain language of 19 U.S.C. § 1675(c)(1) does not permit such treatment.

But even if this plain language did not exist, it remains that the agencies did not publish the order on January 23, 2009; there was no requirement of prospective cash deposits in place on that date, or at any time until November 4, 2009. The retroactive collection of cash deposits established in the November 4, 2009 order (*i.e.*, the notification that January 23, 2009 would be the "effective date") is not the legal equivalent of having timely instituted prospective cash deposits. As the Court found, the delay in publishing the order deprived DSMC of a remedy to which it had a legal right (*i.e.*, an on-going collection of cash deposits between January 23, 2009

17

and November 4, 2009). *Diamond Sawblades Mfrs. Coalition v. United States*, 33 CIT 1422, __,

650 F. Supp. 2d 1331, 1355-56 (2009), *aff'd, Diamond Sawblades Mfrs. Coalition v. United

States*, 626 F.3d 1374 (Fed. Cir. 2010). The agency may have ordered the retroactive collection

of such deposits when it published the antidumping duty order, but as the Court has already

opined, retroactive collection of moneys is not the same as their ongoing collection. *Diamond

Sawblades Mfrs. Coalition v. United States*, 33 CIT 1422, __, 650 F. Supp. 2d 1331, 1355-56

(2009) ("The Court cannot agree that the future collection of cash deposits (or, as the case may

be, the collection of retroactive duties, with interest) provides the same benefit to [DSMC] as

would immediate issuance of an order and the collection of cash deposits."). Rather, an order is

defined in particular by prospective deposit collection. 19 U.S.C. § 1673e(a).

Defining the publication date of an order for purposes of 19 U.S.C. § 1675(c)(1) by a date

other than when prospective cash deposits became required thus does not make sense in light of

the terms of 19 U.S.C. § 1673(e). Regardless of any ambiguity in the terms of "date of

publication," as that phrase appears in 19 U.S.C. § 1675(c)(1), the definition of "antidumping

duty order" is clear from 19 U.S.C. § 1673e(a). Any interpretation of 19 U.S.C. § 1675(c)(1) that

does not comport with 19 U.S.C. § 1673e(a) is not reasonable.[7]

The legislative history of the Tariff Act demonstrates that the prospective collection of

estimated cash deposits is intended to limit the harm to the domestic industry caused by unfairly-

traded imports pending the Department's final assessment of duties on subject merchandise. *See*

S. Rep. No. 96-249, at 76 (1979), *reprinted in* 1979 U.S.C.C.A.N. 315 ("the requirement that

estimated antidumping duty deposits be made as security pending liquidation should reduce the

damage which delayed assessment may cause a domestic industry . . ."). H.R. Rep. No. 96-317,

---

[7]     Again, additional infirm interpretations of the Tariff Act cannot rectify the agencies' past
errors of interpretation.

at 62 (1979), *reprinted in* 1979 U.S.C.C.A.N. 1293 (explaining that the authority to require the posting of a cash deposit or other security is "to ensure protection of the revenue."); *Id.* at 69 ("The [House Committee on Ways and Means] believes that the requirement of cash deposits will ensure that complete information will be submitted to the [Department] in a timely manner."). The CIT has also recognized that cash deposits play an important role in restricting the flow of unfairly-traded goods in the United States. *See Decca Hospitality Furnishing, LLC v. United States*, 30 CIT 357, 365-66, (2006); *Tianjin Magnesium Int'l Co., Ltd. v. United States*, 32 CIT 1, 533, __,   F. Supp. 2d 1327, 1331 n.12 (2008) (noting that "cash deposit rates are important in providing provisional relief to the domestic industry").   Cash deposits are thus an important means of providing relief to a domestic industry that has been found to be injured or threatened with material injury by reason of unfair imports.

        As such, the collection of prospective cash deposits is unique. These deposits, as required of importers on an ongoing basis, alter the cost of importing subject merchandise in real-time. Five years of such prospective, altered costs for importers[8] were what DSMC earned the right to upon this Court's affirmation of the Commission's material threat determination. *See, e.g.*, 19 U.S.C. § 1673e(a). The Department's illegal deferment of the enforcement of that right, through its failure to properly interpret the Tariff Act in the first instance, cannot be wiped away by *new* failures to properly interpret the Tariff Act, and *new* actions that deprive DSMC of a portion of the remedy to which it has been found to have a clear and indisputable right.

        At bottom, the agencies' arguments spring from their misunderstanding on this point. Despite admitting that no order was published until November 4, 2009, they claim that "the order has been in effect since January 23, 2009." Def.'s Resp. at 8; *see also id.* (claiming that waiting

---

[8]      With the nature of those costs potentially adjusted pursuant to administrative reviews.

until November 4, 2014 to conduct a sunset review would mean that the order would be in place for five years and nine months without a review). But there was no order on January 23, 2009, or at any time until the November 4, 2009 publication date. The retroactive collection of cash deposits upon publication of an order does not alter time itself.[9] Nor does it revise the plain language of 19 U.S.C. § 16735e(a). To now interpret the Tariff Act as allowing the early initiation of a sunset review despite the fact that such a premature review will impermissibly shorten the relief to which DSMC is entitled, is unreasonable and cannot be sustained.

> **2.     The Agencies' Past Practice Indicates That Their Current Interpretation is Unreasonable and Not In Accordance with Law**

The agencies attempt to dismiss the fact that the interpretation of the Tariff Act they give here is inconsistent with their past practice generally, as well as their specific practice with respect to the conduct of administrative reviews of this order. Def.'s Resp. at 9. But, these facts cannot be so lightly waved aside.

---

[9]     Moreover, retroactive suspension of liquidation (and, accordingly assessment of duties) effective as of a date earlier than publication is standard in antidumping duty investigations. In such investigations, the liquidation of incoming entries is generally suspended as of the date of publication of the Department's preliminary less-than-fair-value determination. *See* 19 U.S.C. § 1673b(d)(2). Although made before an order is put into effect, these suspended entries are liquidated in accordance with the order, *i.e.*, duties are assessed on them pursuant to the order. *See, e.g.*, 19 U.S.C. § 1673d(c)(4); 19 U.S.C. § 1673e(a). For example, the antidumping duty order on aluminum extrusions from China was published on May 26, 2011; however, entries were suspended as of November 12, 2010, and the first administrative review of the order covered the period from November 12, 2010 through April 30, 2012. *See Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 77 Fed. Reg. 40,565, 40,567 (Dep't Commerce July 12, 2012); *Aluminum Extrusions from the People's Republic of China*, 76 Fed. Reg. 30,650, 30,651 (Dep't Commerce May 26, 2011) (antidumping duty order). Here too, the initial review covered the period from the initial suspension of liquidation through October 31, 2010. *Diamond Sawblades and Parts Thereof From the People's Republic of China*, 78 Fed. Reg. 11,143 (Dep't Commerce Feb. 15, 2013) (final results of antidumping duty admin. review; 2009–2010). That the period of retroactive suspension here was longer than normal was wholly due to the Department's erroneous delay in publishing the order. The agency cannot remedy this through further deprivations of DSMC's rights.

The agencies have never previously interpreted 19 U.S.C. § 1675(c)(1) in the manner they do now. No prior sunset review has ever been initiated or conducted based on a date other than the actual publication date of the order. The agencies concede that this is so. Def.'s Resp. at 9. They explain that, previously, there was no need to consider an interpretation of 19 U.S.C. § 1675(c)(1) that would permit reviews to be conducted on the basis of a date other than the publication date. *Id.* A perceived need, however, is not an explanation as to how the statute can reasonably be read to permit the interpretation now advanced.

Importantly, as mentioned previously, the agencies' interpretation of the phrase "date of publication of . . . an antidumping duty order," as it appears in 19 U.S.C. § 1675(c)(1), is undermined by their treatment of the same term in 19 U.S.C. § 1675(a)(1). *See supra* Part IV.A. Both 19 U.S.C. § 1675(c)(1) and 19 U.S.C. § 1675(a)(1) premise certain agency actions on the date of publication of an antidumping duty order. For purposes of initiating a sunset review, the agencies have interpreted "date of publication" to mean January 23, 2009. But, in conducting administrative reviews of the order, the Department has interpreted that same language, as it appears in 19 U.S.C. § 1675(a)(1), to mean November 4, 2009. Apart from the fact that such varying interpretations of identical terms within the same statute do not conform to Supreme Court precedent, *see Gustafson*, 513 U.S. at 570 ("identical words used in different parts of the same act are intended to have the same meaning,") (citation omitted), the agencies' explanation of this disparate treatment is nonsensical. They state that there is no provision in the statute regarding how long an order may exist without administrative reviews, whereas the Tariff Act requires revocation of orders pursuant to sunset reviews, *see* 19 U.S.C. § 1675(d)(2), unless the sunset review determines that revocation is likely to result in the continuation or recurrence of dumping and injury. Def.'s Resp. at 9. The connection between these facts and the agency's

interpretation of identical statutory language with respect to "the date of publication of an order" is unclear. The explanation appears to be only that administrative reviews are not sunset reviews. Vague references to the "order's history and the overall statutory scheme" notwithstanding, *see* Def.'s Resp. at 10, this does not provide any persuasive reason as to why identical statutory language governing the two types of reviews can be interpreted disparately, such that the "date of publication of [the] antidumping duty order" is the actual date of the order's publication, *i.e.*, November 4, 2009 for administrative reviews, but is January 23, 2009 for the sunset review.

Administrative reviews of the antidumping duty order based on the November anniversary date are ongoing. Indeed, the Department just recently initiated the fourth such administrative review. *Initiation of Antidumping and Countervailing Duty Administrative Reviews and Request for Revocation in Part*, 78 Fed. Reg. 79,392, 79,394 (Dep't Commerce Dec. 1, 2013). As such, based on its current interpretation, the Department is simultaneously conducting a sunset review and an administrative review that are premised on entirely different dates of publication of the exact same order, *i.e.*, January 23, 2009 as the date of publication for purposes of the sunset review and November 4, 2009 as the date of publication for purposes of the administrative review. The agencies have not provided any reasonable basis for this inconsistent treatment of the statutory language. *See Agro Dutch Industries*, 508 F.3d at 1032 (explaining that "a 'term should be construed, if possible, to give it a consistent meaning throughout' a particular statute." (citation omitted).

### 3.    The SAA Does Not Support the Agencies' Interpretation

Although their interpretation of 19 U.S.C. § 1675(c)(1) is inconsistent with both the underlying facts and this Court's prior statements regarding the legal ramifications of cash

deposits versus retroactive duty collection,[10] the agencies nonetheless claim that their reading of the statute is supported by the SAA. Def.'s Resp. at 7. But, a review of the cited provisions shows otherwise.

The agencies quote the SAA as explaining that Article 11.3 of the WTO Antidumping Agreement requires that "duties . . . terminate (or 'sunset') not later than five years from the date of : (1) their imposition; (2) the most recent review that covered both dumping and injury; or (3) the most recent 'sunset' review." Def.'s Resp. at 7 (quoting SAA accompanying H.R. Rep. No. 103-316, at 817 (1994), *reprinted* in 1994 U.S.C.C.A.N. 4040, 4158). But, as the agencies appear to admit, this provision alone does not say anything about when reviews are to be conducted – only when duties are to terminate. Thus, the agencies go on to cite an additional provision, which observes that "section 751(c)(1) "'requires Commerce and the Commission to conduct a [five-year] review no later than five years after the issuance of an antidumping duty order.'" *Id.* (quoting SAA accompanying H.R. Rep. No. 103-316, at 879 (1994), *reprinted* in 1994 U.S.C.C.A.N. 4040, 4205).

By this, the agencies do not appear to argue that the SAA requires reviews to be *completed* "no later than five years" after the date of publication of an antidumping duty order– an interpretation that would render all of the agencies' sunset reviews illegal.[11, 12] Rather, they

---

[10]    The agencies argue that the Federal Circuit's decision upholding this Court's grant of a writ of mandamus should be read as confirming that "Commerce correctly gave the order a retroactive date." Def.'s Resp. at 6. But this question was never considered by either this Court in its mandamus opinion, or by the Court of Appeals. Finding that the agency was legally obligated to begin collecting cash deposits as of January 23, 2009 is not a finding, one way or the other, on the "correctness" of the agency's later decision, upon publication, to state that the "effective date" of the order was January 23, 2009. It is certainly not a finding as to the effects of such a statement on the administration of a sunset review.

[11]    As noted in DSMC's complaint, all sunset reviews conducted by the agencies since the passage of the URAA (save this one) have been initiated by notices published approximately 30 days before the fifth anniversary of the date of publication of the order. Even under the quickest

simply state that the SAA requires "that orders be reviewed every five years." Def.'s Resp. at 7.

DSMC agrees. The SAA and the statute together require that, as the statute states, every "five

years after the date of publication of . . . an antidumping duty order," a sunset review shall be

conducted. 19 U.S.C. § 1675(c)(1).

But the salient question here is not *whether* a review is to be conducted. It is *when* it is to

be conducted, and the date from which the requisite five years are to be measured. As shown

above, the portion of the SAA that the agencies cite as supporting their interpretation of the "date

of publication" does not, in fact, even address the question of that proper date.

---

timelines provided in 19 U.S.C. § 1675(c), a sunset review so initiated could not be completed
prior to the expiration of the fifth anniversary date of the order. 19 U.S.C. § 1675(c).

[12]    To the extent that the Court perceives potential tension between 19 U.S.C. § 1675(c)(1)
and the description of that provision cited above, DSMC notes that the statement is made in the
context of a larger point regarding the benefits that will be realized through automatic initiation
of sunset reviews. The discussion is not focused on the timing of reviews, or on the reasons for
such timing. The statement does indicate that, for example, it is the sense of Congress that the
agencies must conduct their reviews within five years of the issuance of an order. Rather, the
cited statement simply provides a description of 19 U.S.C. § 1675(c)(1). As described above, the
plain language of that provision does not require that a review be conducted within five years of
publication; rather, while initiation notices must be published "no[] later than 30 days before the
fifth anniversary of the date [of publication of an antidumping duty order]," sunset reviews
themselves shall be conducted "5 years after the date of publication of . . . an antidumping duty
order." 19 U.S.C. §§ 1675(c)(1) & (2).

Given the focus of the cited section of the SAA on the benefits of automatic initiation, there is no
necessary conflict between the SAA and the language of the Tariff Act itself: the SAA simply
confirms that reviews will be initiated "no[] later than 30 days before the fifth anniversary of the
date [of publication of an antidumping duty order]." The agencies themselves do not argue
otherwise; as noted above, they do not contend that the SAA requires that the sunset review
process must be completed within five years of the publication of an antidumping duty order. As
such, while the agencies are correct in stating that, per 19 U.S.C. § 3512(d), the SAA is to be
regarded "as an authoritative expression by the United States concerning the interpretation and
application of the [Uruguay Round Agreement Act]." Def.'s Resp. at 7 n.1 (quoting 19 U.S.C.
§ 3512(d)), that fact would appear not to compel a reading of 19 U.S.C. § 1675(c) that is
inconsistent with that statute's plain language.

### 4.   The Agencies' Regulations and Citations to Past Judicial Precedent Do Not Support Their Interpretation

The agencies also offer an analysis of their regulations and prior judicial precedent in support of their interpretation of the statute. However, as are their other explanations, this too is unpersuasive, and does not provide a reasonable basis for their interpretation.

The agencies begin by citing a Policy Bulletin that the Department issued in 1998 with respect to the conduct of sunset reviews. This Policy Bulletin observes that the URAA amended "the Tariff Act of 1930 . . . by requiring that . . . orders be revoked . . . after five years" in certain circumstances. Def.'s Resp. at 8 (quoting *Policies Regarding the Conduct of Five-year ("Sunset") Reviews of Antidumping and Countervailing Duty Orders; Policy Bulletin*, 63 Fed. Reg. 18,871, 18,872 (Dep't Commerce Apr. 16, 1998). They then proceed to cite approvingly to two Federal Circuit cases for the proposition that they be permitted to interpret the statute to allow for early initiation here.

The agencies' arguments are not persuasive. The quotation from the Policy Bulletin is not germane to the point; it does not say anything about the date from which "five years" are to be measured, or when reviews are to be conducted on that basis. The agencies' case citations actually appear to undermine their arguments, as the cases either state that sunset reviews are to be conducted "every five years *after* the issuance of an antidumping duty order" or otherwise simply indicate that reviews are conducted every five years. Def.'s Resp. at 8 (quoting *NSK Corp. v. United States ITC*, 716, F.3d 1352, 1355 (Fed. Cir. 2013)).

### 5.   Conclusion

In sum, apart from the fact that the agencies' interpretation of 19 U.S.C. § 1675(c)(1) is inconsistent with the plain meaning of that provision's terms, their interpretation is also unreasonable. It is based on a misunderstanding of the nature of an antidumping duty order, as

**PUBLIC DOCUMENT**

well as the facts of this case. It requires inconsistent interpretation of identical statutory language, and involves them in acting inconsistently with their own interpretation of that language as it governs administrative reviews of the order on Chinese diamond sawblades. It finds no support in the SAA, the agencies' own policies, or prior precedent generally. Indeed, the agencies concede that their interpretation here is highly unusual. *See generally* Def.'s Resp. at 5-10. The agencies are required to act in accordance with law. But the law is rendered meaningless if it can be violated any time that an agency confronts an unusual situation. The agencies' interpretation of the statute is thus unreasonable and is not entitled to judicial deference.

## VII.    CONCLUSION

For the foregoing reasons, DSMC respectfully submits that the Department's and the Commission's decision to conduct a five-year "sunset" review of the antidumping duty order on diamond sawblades from China prior to the conclusion of five years from the date of publication of the order is not in accordance with law. In light of this illegality, DSMC respectfully requests that this Court declare the agencies' review(s) *ultra vires*, and require the agencies to terminate their conduct of any sunset review of the antidumping duty order on diamond sawblades and parts thereof from China that is not in accordance with 19 U.S.C. § 1675(c), which does not permit such a review to be conducted until after five years have passed from the November 4, 2009 date of publication of the antidumping duty order.

Respectfully submitted,

Daniel B. Pickard
Maureen E. Thorson

**WILEY REIN LLP**
1776 K Street, N.W.
Washington, D.C.  20006
(202) 719-7000

*Counsel to the Diamond Sawblades*
*Manufacturers' Coalition*

Dated: March 28, 2014

<u>CERTIFCATE OF COMPLIANCE</u>

Pursuant to Chamber Procedure 2(B)(1), the undersigned certifies that this brief complies with the word limitation requirement. The word count for Plaintiff Diamond Sawblades Manufacturers' Coalition's Memorandum in Support of its Rule 56.2 Motion for Judgment on the Agency Record, as computed by Wiley Rein LLP's word processing system (Microsoft Word 2010), is 9,943 words.

(Signature of Attorney)

<u>Daniel B. Pickard</u>
(Name of Attorney)

<u>The Diamond Sawblades Manufacturers' Coalition</u>
(Representative Of)

<u>March 28, 2014</u>
(Date)

## CERTIFICATE OF SERVICE

*Diamond Sawblades Manufacturers' Coalition v. United States Department of Commerce, et al.*
U.S. Court of International Trade
Court. No. 13-00391

I certify that a copy of this document was served on the following parties, by the court's electronic case filing (ECF) system, on March 28, 2014.

**On behalf of the United States International Trade Commission:**

David B. Fishberg
**U.S. International Trade Commission**
Office of the General Counsel
500 E Street, SW
Washington, DC 20436

**On behalf of the United States Department of Commerce:**

Alexander V. Sverdlov
**U.S. Department of Justice**
P.O. Box 480
Ben Franklin Station
Washington, DC 20044

13687068.1